**AMEX ASSURANCE COMPANY, Plaintiff–Counter–Defendant–Appellee,**

v.

**Cristina CARIPIDES, Defendant–Cross–Claimant–Appellant,**

**and**

**Estate of William G. Caripides, Defendant Appellee, Estate of Gabriella M. Caripides, Defendant–Cross–Defendant, Ted Caripides, Helen Agabides and Vera Grozdav and Rita Catar, Defendants–Cross–Defendants–Appellees.**

**Docket No. 02–7044.**

United States Court of Appeals, Second Circuit.

Argued: Aug. 29, 2002.

Decided: Jan. 9, 2003.

Gary L. Rubin, Mazur, Carp & Rubin, P.C., New York, NY, for Defendant–Cross–Claimant–Appellant.

Charles T. Locke, Locke & Herbert, New York, NY, for Plaintiff–Counter–Defendant–Appellee.

Robert A. Cohen, Dechert Price & Rhoads, New York, N.Y. (Debra D. O'Gorman, on the brief), for Defendants–Cross–Defendants–Appellees.

Before: LEVAL, SOTOMAYOR, Circuit Judges and KOELTL, District Judge.*

Judge LEVAL also files an opinion expressing separate views.

* The Honorable John G. Koeltl, United States District Judge for the Southern District of New York, sitting by designation.

**156**

LEVAL, Circuit Judge.

AMEX Assurance Company ("AMEX") brought this interpleader action pursuant to 28 U.S.C. § 1335 to determine the rightful beneficiaries of two $1 million insurance policies covering accidental death during airline travel for William ("William") and Gabriella ("Gabriella") Caripides, husband and wife, who perished in the Swissair crash off Nova Scotia on September 2, 1998. The rival contenders for the proceeds of the policies were 1) their 28–year-old daughter Cristina Caripides; 2) William's siblings Ted Caripides, Helen Agabides, and Vera Grozdav ("the Siblings") with respect to the policy covering William, and Gabriella's parents Peter and Rita Catar ("the Parents") with respect to the policy covering Gabriella; and 3) the estates of William and Gabriella ("the Estates"). Because the insured had made no designation of beneficiaries, the proceeds were payable under the default schedule of beneficiaries listed in the policies. That schedule listed *"dependent* children" after "spouse," and thereafter listed siblings and parents; it made no provision whatsoever for non-dependent children. The court therefore granted summary judgment to the Siblings and the Parents, rejecting the claim of the insureds' independent daughter Cristina.

We affirm.

### BACKGROUND

William and Gabriella Caripides, together with their son Peter, died September 2, 1998 when Swissair flight 111 crashed off Nova Scotia. Their only surviving child was Cristina, then age 28. At the time, William and Gabriella were each covered by two separate accidental death insurance policies issued by AMEX. The first, which is not involved in this appeal, was a $100,000 policy, AX0948 (hereinafter "0948"), under which William and Gabriella were each automatically covered because they purchased their airline tickets with a standard American Express card. Because no beneficiary had been designated under this policy, the proceeds were payable pursuant to the default provisions of the policy. The default provisions specified that in the absence of a designation the proceeds would go to a surviving spouse, and in the absence of a surviving spouse to the insured's children. No party contested Cristina's entitlement as a surviving child to the $200,000 payable under these two policies.

In addition, William had subscribed for himself and Gabriella to a $1 million Automatic Flight Insurance Policy issued by AMEX. Once again, William had designated no beneficiary; payment of the $2 million is accordingly governed by the default provisions of the policy. The proper disposition of these benefits under the default provisions of the policy is the subject of this appeal. The evolution of these default provisions is significant.

William's original enrollment in AMEX's program of Automatic Flight Insurance was in March 1984 under a policy designated as GA 5145 (hereinafter "5145"), sponsored by the Fireman's Fund Insurance Company. Under this policy, in exchange for a fee per covered person per trip charged each time airline tickets were purchased with an American Express card, the holder of this policy could choose $250,000, $500,000 or $1,000,000 of coverage. William selected coverage at the $1 million level for both himself and Gabriella.

Such a policy invites the subscriber to designate who will be the beneficiary of the proceeds, but goes on to specify a hierarchy of default beneficiaries who will

take in the event no designation is made. Under 5145, in the absence of a designation, the benefits were to be paid first to the surviving spouse, and if there was no surviving spouse, to the covered person's "children." (The list went on to name other categories that would take in the absence of surviving spouse or surviving children.) From 1984 through May 1989, William maintained coverage under that policy, without ever making a designation of beneficiary.

In May 1989, AMEX replaced the 5145 policy. For all insureds other than residents of the State of New York, the replacing policy was designated AX 0950 (hereinafter "0950"). This policy provided for default beneficiaries in a manner similar to its predecessor, naming first the spouse, and in the absence of a surviving spouse, any surviving children.

As to New York residents, 5145 was replaced with a different policy designated as AX 0910 (hereinafter "0910"). New York resident subscribers to 5145 were solicited to enroll under 0910. William enrolled, again choosing the $1 million level of protection, covering both himself and Gabriella.

The enrollment was by means of a summary form, which did not reveal the detailed terms of the policy, including the schedule of default beneficiaries. It was only after sending the enrollment form that the subscriber would receive the full policy. The pre-printed form that William signed in order to subscribe to coverage stated, "I understand that this coverage will replace any coverage previously in effect under the policy."

The default provisions of 0910, however, were significantly different from the predecessor policy and from 0950. The new default hierarchy of 0910 begins like the predecessor policy by giving the proceeds to the surviving spouse. If there is no surviving spouse, the proceeds go not to the covered person's "children," but to "dependent children." "Dependent children" is defined to include primarily unmarried children under 19 who are dependent on the covered card member.[1] If the deceased covered person is survived by neither a spouse nor dependent children, the next takers are the decedent's parents or, if none of them survives, brothers and sisters, and finally, if there is no survivor among any of those categories, the decedent's estate. Thus, for a covered person who has not designated a beneficiary, the default provisions of 0910 completely exclude children who are not "dependent." Cristina, who was 28 years old at the time of her parents' death, was not a dependent child.

Approximately six years after subscribing to the replacement policy 0910, on March 17, 1995, William and Gabriella executed wills. Each of William and Gabriella, in subparagraph Third of their respective wills, made a conditional bequest of $10,000 to Cristina, which was payable only if the testator's spouse had predeceased. Each will went on to specify, "I

---

1. The policy's definition of "Dependent Children" is as follows:

the unmarried children, step-children, proposed adopted children placed with the Cardmember before finalization of adoption, or legally adopted children under age 19 who are chiefly dependent upon such Cardmember. Any child resident in the State of New York who, prior to attainment of age 19, became so handicapped as to be incapable of self-sustaining employment because of mental illness, developmental disability, mental retardation as defined in the mental hygiene law of the State of New York or physical handicap and who continues to be chiefly dependent upon such Cardmember for support and maintenance, shall be deemed a Dependent Child, regardless of age at the time enrollment for insurance is made.

intentionally make no provisions, other than those set forth in this Subparagraph, for my daughter, Cristina Caripides."

After the Swissair disaster that killed her parents, Cristina filed claims with AMEX, asserting that she was the beneficiary of the two $100,000 policies and the two $1 million policies. As to the latter, Cristina incorrectly believed the pertinent policy was 0950, the policy issued to replace the original 5145, for residents of all states other than New York. Under the terms of 0950, in the absence of a surviving spouse, the "children" were the default beneficiaries.

Thereafter, the estates of William and Gabriella each filed a claim as the beneficiary of the other's policy. The estate of Gabriella claimed that Gabriella was the default beneficiary of the policy covering William. The estate pointed to subparagraph Tenth of William's will, which provided that if William and his wife died "simultaneously . . . or under such circumstances as to render it impossible or difficult to determine who predeceased the other, then [William] shall be deemed to have predeceased . . . Gabriella." Giving effect to that provision, Gabriella's estate argued that Gabriella was William's surviving spouse and was therefore the prime default beneficiary.

William's estate asserted that Gabriella's will contained a similar mirror-image provision, deeming William to be the survivor if he and Gabriella died in circumstances making it difficult to determine which one predeceased.[2] On that basis, William's estate argued that William should be deemed to have survived Gabriella and to have been the default taker under Gabriella's policy.

*Proceedings Below*

On May 14, 1999, faced with competing claims for the proceeds of the two policies, AMEX commenced this interpleader action to determine whether Cristina or the Estates were the proper beneficiaries of the policies. It deposited the proceeds of the pertinent policies into the court. In its interpleader complaint, AMEX incorrectly asserted that the pertinent $1 million policies were 0950, and attached a copy of 0950. The parties agreed to a stipulation discharging AMEX as a party in the suit with the proviso that it would make itself amenable to the court's jurisdiction, discovery demands, and subpoenas as though it remained a party to the litigation.

Within the next year apparently, AMEX discovered its error as to which $1 million policy was involved. In February 2000, Eric Marhoun, Vice President and General Counsel of AMEX, submitted an affidavit in which he revealed that AMEX had been incorrect in its assertion that William and Gabriella were covered by the 0950 policy when in fact, because they were residents of New York State, they were covered by 0910. The recognition that William and Gabriella were covered not by 0950 but 0910 substantially undermined Cristina's claim because, as noted above, while under 0950 the second place default beneficiary after surviving spouse is "children," in the case of 0910 that place is occupied by "dependent children," and "children" alone does not appear on the default schedule.

In June 2000, the district court became aware that at the time of the crash William was survived by three siblings, Ted Caripides, Helen Agabides and Vera Grozdav, and Gabriella was survived by her parents Rita and Peter Catar. Because the default provisions of 0910 provided for siblings

---

**2.** The copy of Gabriella's will attached to the papers in the district court omitted the page which specified which spouse should be deemed the survivor in the event of death in a common disaster.

and parents, the court ordered that William's siblings and Gabriella's parents be joined as parties to the action.[3]

The district court appointed an expert witness on insurance, Alexander Chernoff, to report on the issues presented. In his report filed January 24, 2001, Chernoff stated that he had "never encountered a beneficiary default provision which differentiates dependent and non-dependent children" as in 0910.

Cristina retained her own expert, Martin Minkowitz. Minkowitz asserted the concept "dependent children" was pertinent only in the area of health insurance (it is a defined term in New York Insurance Law § 3216 which regulates health coverage) and that its use in the AMEX life insurance policy was an error and was "inconsistent with the necessary and appropriate use" of the term. Although Minkowitz acknowledged that the "dependent children" language in 0910 had been ratified by the New York Insurance Department along with the rest of the policy (consistent with statutory requirements), he maintained that that had been an oversight. Minkowitz appended an affidavit of Frederic Bodner, former Chief of the Life and Health Bureau of the Department of Insurance, to the effect that the approval of the term "dependent children" in the context of this policy was a mistake. Minkowitz opined that the court should "reform" the 0910 policy, substituting "children" for "dependent children," bringing it in line with 5145, the policy it had replaced.

On July 18, 2001, Cristina filed an amended answer to the AMEX complaint, asserting various counterclaims and cross-claims. Among her claims, she asserted that the default beneficiary provision of 0910 is unenforceable under New York Estates, Powers, and Trusts Law ("EPTL") § 13–3.2, which stipulates that all beneficiary designations under life insurance policies must be "made in writing and signed by the person making the designation." She also claimed that the default provision in favor of children to the exclusion of non-dependent children violates the public policy espoused in EPTL § 4–1.1, which provides that the property of a decedent, if not covered by a will, go to a spouse and children, indicating that children are given priority in inheritance over the siblings and parents of the decedent. Cristina also sought reformation of the contract under the teaching of *Hay v. Star Fire Insurance Co.*, 77 N.Y. 235 (1879), on the grounds that the substitution of "dependent children" in 0910 for "children" under the predecessor policy was a mistake on AMEX's part, and that William had enrolled in the policy believing that its default beneficiary provision still included non-dependent children.

On October 9, 2001, the district court directed the parties to show cause why summary judgment should not be awarded on the two $1 million policies to the Siblings and the Parents, respectively. On January 3, 2002, the district court granted summary judgment, awarding the proceeds of William's policy to the Siblings, and the proceeds of Gabriella's policy to the Parents. The court rejected Cristina's claims and those of the Estates. Cristina appealed. The Estates have not.

---

**3.** Peter Catar died before the district court became aware of the need to join him. Neither he nor his estate was joined as a party because the court was satisfied that his wife Rita would adequately represent his interests in the litigation. Against the district court's repeated advice, the Siblings and Parents initially represented themselves in this matter. In March 2001, the Siblings retained counsel, whom the district court directed to represent Mrs. Catar as well.

## DISCUSSION

Cristina raises three principal arguments on appeal: 1) The district court erred in determining that the contract was unambiguous, because when William signed the generic enrollment card in December 1989, he probably believed that he was subscribing to a policy with terms similar, at least as to default beneficiaries, to the previous policy 5145; 2) the default beneficiary provisions are unenforceable because they do not satisfy the writing requirement of EPTL § 13–3.2; 3) Policy 0910 should be reformed under the doctrine of *Hay* and its progeny.

### 1. Is the Contract Ambiguous?

■ Cristina's first argument on appeal is that the court should not have granted summary judgment under the default provisions because the insurance contract was ambiguous. We do not agree.

To be sure, as discussed below, the circumstances under which an insured subscribed to the policy 0910 created a significant risk of confusion as to who would take in the absence of a designation of beneficiary. But the potential for confusion resulted from the piecemeal disclosure of terms, not from inherent ambiguity in the terms. If one reads the listing of default beneficiaries provided in 0910, there is no doubt that the second slot (after surviving spouse) is occupied by "dependent children" and not by children. The policy is not ambiguous on its face.

### 2. Do the Beneficiary Default Provisions Violate EPTL § 13–3.2?

■ Cristina next argues that the default beneficiary provisions of 0910 are unenforceable because they do not comply with the requirement under New York law that all designations of beneficiaries of life insurance policies be attested in writing.

New York Estates, Powers, and Trusts Law § 13–3.2(e) provides

A designation of a beneficiary or payee to receive payment upon death of the person making the designation or another must be made in writing and signed by the person making the designation. . . .

Cristina relies on two cases, *Androvette v. Treadwell*, 73 N.Y.2d 746, 536 N.Y.S.2d 43, 532 N.E.2d 1271 (1988), and *Mohawk Airlines, Inc. v. Peach*, 61 A.D.2d 346, 402 N.Y.S.2d 496 (4th Dep't 1978). They stand for the general proposition that the writing requirement in § 13–3.2(e) will be interpreted strictly, but do not address the application of that provision to default terms. We agree with the district court that William's reliance on the default beneficiary provision of the underlying contract was not a "designation of a beneficiary" within the meaning of the statute. It was the opposite.

William had the option of either designating his beneficiaries, or, in the absence of an adequate designation, relying on the default list provided by the policy. He chose the latter course. Cristina's argument depends on a distortion of the literal meaning of designation; it reads a failure to designate as a designation. Second, her argument would have the effect of undermining and distorting the reasonable expectations of countless subscribers to such insurance. We can see no reason to believe that New York intended its statute to be construed in such a capricious fashion.

### 3. Should the Schedule of Default Beneficiaries Be Reformed?

■ Cristina argues that William and Gabriella's 0910 policies should be reformed so that they conform to the default beneficiary provision of the policy they replaced. She contends that authority for such reformation can be found in the deci-

sion of the New York Court of Appeals in *Hay*. In *Hay*, the plaintiff was insured against fire by defendant Star Fire Insurance on her interest as a mortgagee in property. 77 N.Y. at 238. After increasing the size of the mortgage from $2500 to $3000, plaintiff applied to Star for a renewal of the policy, to which Star agreed. Without advising the plaintiff, however, Star inserted into the renewal a subrogation clause, providing that in the event of a loss, plaintiff would assign to defendant her right to be compensated by other parties, and defendant would be liable on the policy only to the extent she had not already been adequately compensated for her loss by those other parties.

The Court of Appeals granted plaintiff's application for reformation of the policy. The Court observed,

It was bad faith on the part of the defendant to change so radically the terms of the policy, and deliver it as a policy simply renewing the old one, without notice of the change. A party, whose duty it is to prepare a written contract, in pursuance of a previous agreement, to prepare one materially changing the terms of such previous agreement and deliver it as in accordance therewith, commits a fraud which entitles the other party to relief according to the circumstances presented. Equity will reform a written instrument in cases of mutual mistake, and also in cases of fraud, and also where there is a mistake on one side, and fraud on the other.

*Hay*, 77 N.Y. at 240.

Unlike *Hay*, the new policy was not described by the insurer as a simple "renewal" of the preexisting policy. Nonetheless, AMEX, while leading its subscribers to believe that the replacement policy would substantially conform to its predecessor, changed a very important term without calling the change to the subscribers' attention. AMEX did nothing to alert its subscribers to the fact that it had changed a default beneficiary class from "children" to "dependent children."

On the other hand, the undisclosed change made by the insurer in *Hay* was for its own benefit; for that reason, the insurer's failure to draw the insured's attention to it was described as a fraud. In our case, the insurer had no interest whatsoever in the order of priority of default beneficiaries. The insurer provides such default provisions as a convenience to the insured and has no interest in who takes the proceeds. Thus, while AMEX may well have been at fault either in making the change or in failing to call attention to it, that fault seems to be more in the nature of carelessness or negligence; it cannot easily be characterized as fraud, in the usual sense of the word.

The question we face is whether on our facts New York courts would allow reformation of the default beneficiary provisions of the policy. *Hay* and other New York cases conventionally recite that reformation is available in cases of fraud and mutual mistake. *See Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 573, 498 N.Y.S.2d 344, 489 N.E.2d 231 (1986); *George Backer Mgmt. Corp. v. Acme Quilting Co., Inc.*, 46 N.Y.2d 211, 413 N.Y.S.2d 135, 139, 385 N.E.2d 1062 (1978). Our facts do not fit under either rubric.

For the reason stated, AMEX's conduct was not fraudulent. Nor is this a case of *mutual* mistake. While William may have mistakenly believed the policy, in the event either he or Gabriella perished without leaving a surviving spouse, would pay its benefit to their children, in preference to their parents and siblings, this mistake was not mutual. AMEX had drafted the policy and knew what it pro-

vided. *See* RESTATEMENT (SECOND) OF CONTRACTS § 155 cmt. a (1981) (as used in the doctrine of "mutual mistake," mistake means being in error in one's belief as to what the contract states); *L. Lewitt & Co., Inc., v. Jewelers' Safety Fund Soc'y*, 249 N.Y. 217, 221–23, 164 N.E. 29 (1928). We therefore hold that these facts do not come within the circumstances in which New York law will allow reformation of a contract. There having been neither fraud nor mutual mistake, the mistake of a single party as to a term of the contract does not justify reformation under New York law. We therefore affirm the district court's rejection of Cristina's third argument.

### 4. Other Arguments

We have considered Cristina's other arguments and find them to be without merit. Accordingly, we affirm the judgment of the district court.

### Judge Leval's Separate Views

In the remainder of this opinion, I speak for myself alone and not for my colleagues or for the court.

### a. Reformation

I believe that in the case of an insured's mistake, relating to the default beneficiary provisions of such a policy, the New York courts might contemplate broadening their rule to allow reformation in circumstances going beyond fraud or *mutual* mistake. Ordinarily when parties have agreed to a written contract, disputes will be governed by its terms. If one party is favored by a term of the contract, that party is presumed to have bargained for that term and relied on it, and is therefore entitled to judgment on the basis of that term unless a powerful reason exists to the contrary. Courts have generally found that sufficient reason exists to deprive the party of its reliance on the advantageous term where

the party has procured the contract term through fraud on the other party to the contract. In such cases, the contract will be reformed. *See Welles v. Yates*, 44 N.Y. 525, 530 (1871). And where there was mutual mistake, so that the advantaged party in fact believed the particular contract term was otherwise and favored the other party, then the hypothesis that the advantaged party bargained for the advantageous term and relied on it is inapplicable; there is little reason to protect a party's interest in a contract term that the party believed was otherwise. *See Harris v. Uhlendorf*, 24 N.Y.2d 463, 301 N.Y.S.2d 53, 248 N.E.2d 892 (1969); *Hart v. Blabey*, 287 N.Y. 257, 39 N.E.2d 230 (1942).

Those models presuppose that the term in dispute favors one party to the contract over the other. *See, e.g., Shaw v. Aetna Cas. & Sur. Ins. Co.*, 274 S.C. 281, 262 S.E.2d 903, 905 (1980) (party seeking reformation on the basis of fraud must prove that it was "induced by the fraud, deceit, misrepresentation, concealment, or imposition in any form of the party *opposed in interest* to the reformation" (emphasis added)). On our facts, that is not the case. The listing of default beneficiaries is of interest to only one party to the contract—the insured. The insurer allows the insured complete freedom to override the default schedule by designating the policy's beneficiaries and provides the default schedule to avoid a gap in the event the insured has not made adequate designation, presumably designing the schedule to reflect the likely preferences of the great majority of its customers. (AMEX's lack of interest in who gets the proceeds is reflected by the fact that AMEX proceeded by interpleader, paying the proceeds into court with a prayer that the court direct distribution to whomever may be entitled to receive them and asked to be

excused from the case, except to provide disclosure as sought by the parties.)

It seems to me illogical in such circumstances for the rule of law to bar reformation unless the insurer either committed a fraud or was mistaken as to what the term provided. If a contract term, such as the description of default beneficiaries, affects the interest of only the insured, and a clear showing is made that the insured was mistaken as to what the term provides, while no party to the contract has relied to its detriment on the term as written, those circumstances would seem to provide substantial justification for reformation without any significant reason to deny the remedy. The insurer will not be adversely affected by reformation if the reformed term is one in which it had no interest. In my view, there is no persuasive reason to require, as a prerequisite for reformation, that the insurer have been mistaken as to a term in which it had no interest.

As suits for reformation generally involve a term that favors one of the contracting parties to the other's detriment, the courts of New York have not, it appears, considered whether the circumstances in which reformation is allowed should be broadened to include unilateral mistake on the part of an insured as to a term (such as the specification of beneficia-

ries) in which the insurer has no interest. Should a case arise involving a convincing demonstration[4] that the insured decedent was mistaken as to the beneficiary specified by the policy, courts might find it appropriate to address whether the circumstances justifying reformation should be broadened.[5]

### b. The Danger Created by AMEX's Policy 0910

I add a comment, which pertains not to the dispute between the parties over the proceeds of the insurance, but rather to AMEX's position in relation to its customers. It seems likely from the limited information in the record that AMEX made an error of judgment in the composition of the default beneficiary provisions of policy 0910 insofar as it provided insurance for accidental death. Such default beneficiary provisions, which take effect only when the insured has failed to provide adequate designation, are designed to reflect the predictable desires of the policyholders. There is little reason to suppose that the majority of policyholders would wish that the large benefits be paid on their death only to underage or dependent children to the exclusion of their adult independent children; even less likely is it that they

---

4. Given the very unusual circumstances of the Caripides family, however, it is not clear that Cristina has made a convincing showing that William was mistaken. As noted, there was substantial evidence of estrangement between Cristina and her parents. In addition we were advised by counsel at argument (although it is not a matter of record) that Cristina's brother, who went down with his parents on the plane, was dependent by reason of disability. Thus, there is a reasonable possibility that William might have been aware of and approved the policy terms that would benefit his dependent son but not his independent daughter.

5. Judge Sotomayor disagrees with the views here expressed by Judge Leval. She argues as follows: New York case law makes clear that "the thrust of a reformation claim is that a writing does not set forth the actual agreement of the parties ...." *Chimart*, 66 N.Y.2d at 573, 498 N.Y.S.2d 344, 489 N.E.2d 231. A disputed term can reflect the actual agreement of the parties even if not all parties are advantaged by that term. A rule of law allowing reformation in cases of unilateral mistake where the provision in question allegedly benefits only the mistaken party would invite variance from the terms of unambiguous, otherwise valid contracts, and would disturb the certainty and predictability of contract interpretation.

would wish to prefer their siblings and parents over their children. The unanimous testimony of the expert witnesses suggested that this listing of "dependent children," to the exclusion of "children" in an accidental death policy was unique in their experience. Alexander Chernoff, the court-appointed insurance expert, testified that he had never encountered such an instance.

The affidavit of AMEX Vice President Eric Marhoun suggests how this happened. Policy 0910 was not merely an accidental death policy. It also provided medical benefits for accidental injury. Marhoun asserts that the New York Insurance Department had required AMEX to limit the persons a policyholder could cover for medical benefits to dependent children. AMEX complied by "changing the definition of 'Covered Person' and adding the definition of 'Dependent Children.'" Then, Marhoun asserts, *"For ease of administration,* the default beneficiary provision for death benefits was also revised to reference 'Dependent Children.'" (emphasis added). It thus appears that AMEX adopted for the accidental death protection an unsuitable schedule of default beneficiaries, excluding children, simply to conform to terminology appropriately employed in other portions of the policy. Marhoun's reference to "ease of administration" suggests the change was made in the schedule of default beneficiaries without considering whether policyholders would wish to exclude their children from benefits in the event of the policyholder's death.

I believe persons subscribing to such a policy could reasonably expect that the insurer, in preparing default provisions, would list the default beneficiaries according to the widespread understanding of the wishes of the majority of customers to benefit their children. I think it likely that many purchasers of insurance under policy 0910 believe that their children are named as default beneficiaries, and would be startled to learn that in the event of their death, dependent children, parents and siblings would take to the exclusion of their independent children. It would be a serious misfortune if, in the case of conventional parents who, like most, intend to benefit their children and reasonably believe they are doing so, the million dollar proceeds would go instead to their parents or siblings, or to their children under the age of 19 to the exclusion of the mature children.

Whether in the interest of protecting its customers or in the interest of protecting itself from liability, I think it incumbent on AMEX to adopt measures to guard against the risk of such mistake. The danger exists not only for customers who were originally covered by 5145, but also for new purchasers of 0910. While the likelihood of mistake is greater for customers who purchased 0910 to replace 5145, new purchasers as well were likely to assume that the default provisions of AMEX's policy would reflect the conventional desire of parents to benefit their children at their death.

### CONCLUSION

The judgment of the district court is affirmed.