**TRAVELERS INDEMNITY COMPANY OF ILLINOIS,**
Plaintiff,

v.

**CDL HOTELS USA, INC., and as representative for an unincorporated association of interested insured parties, identified as Millenium Hotels, Defendant.**

**No. 03 Civ. 0716(MBM).**

United States District Court,
S.D. New York.

June 22, 2004.

---

Alan R. Miller, Robins Kaplan Miller & Ciresi, Boston, MA, Michael L. Foran, Robert T. Boylan, Katherine E. Beaumont, Foran Glennon Palandech & Ponzi, Chicago, IL, for Plaintiff.

Robert E. Juceam, Greg L. Weiner, Maria Moukides, Fried Frank Harris Shriver & Jacobson, New York City, Steven N. Goldberg, David B. Goodwin, Nancy Sher Cohen, Heller Ehrman White & McAuliffe, LLP, New York City, for Defendant.

## OPINION & ORDER

MUKASEY, District Judge.

Plaintiff Travelers Indemnity Company of Illinois ("Travelers") provided the second excess layer of property insurance coverage for the Millenium Hotels, including the Millenium Hilton in New York City owned and operated by defendant CDL Hotels USA, Inc. ("CDL"). After the hotel was damaged in the attack on the World Trade Center on September 11, 2001, CDL submitted a claim for, among other things, business interruption because the hotel temporarily ceased operations as a result of the damage. After paying CDL approximately $40 million under the insurance policy, Travelers is suing CDL for a judgment declaring the terms of Travelers' insurance policy and Travelers' rights and obligations thereunder—specifically, a declaration that Travelers is liable for no more than one year's worth of business interruption damages with a 180-day extended period of such damages, or a total of 18 months. Travelers also asserts claims for breach of contract and breach of implied duty of good faith and fair dealing. It seeks as well reformation or rescission based upon mutual mistake and reformation or rescission based upon unilateral mistake so as to conform the terms of its excess policy to the terms it wishes the court to find are controlling.

Travelers has moved to amend its complaint a second time to allege that CDL provided Travelers with estimates for business interruption damages for only one year, rather than three years; and that CDL knew that its premiums for Travel-

ers' excess policy were based upon these one-year estimates rather than three-year estimates. For the reasons stated below, Travelers' motion to amend its complaint is granted upon the condition that Travelers pay CDL reasonable attorneys' fees, which will be determined at a later conference with the parties.

CDL has moved to dismiss Travelers' complaint. CDL's motion to dismiss is denied as to Travelers' first claim for a declaration of the terms of Travelers' coverage, and granted as to all other claims.

## I.

Travelers is an Illinois corporation with its principal place of business in Connecticut. (First Am. Compl. ("FAC") ¶ 2) CDL is a Delaware corporation with its principal place of business in Colorado. (*Id.* at ¶ 3) It owns and operates the Millenium Hilton in New York, New York. (*Id.* at ¶ 4) CDL is a United States subsidiary of Millenium & Copthorne Hotels, plc ("M & C"), a London based company. (*Id.* at ¶ 5) Diversity jurisdiction is present pursuant to 28 U.S.C. § 1332, and venue in this court is proper under 28 U.S.C. § 1391 because the property involved is located in this district and a substantial part of the events giving rise to the action occurred in this district. (*Id.* at ¶¶ 10, 11) New York law, upon which the parties have relied, controls. *See Texaco A/S (Denmark) v. Commercial Ins. Co. of Newark, NJ,* 160 F.3d 124, 128 (2d Cir.1998) (parties' consent to application of forum law completes choice of law inquiry); *American Fuel Corp. v. Utah Energy Development Co.,* 122 F.3d 130, 134 (2d Cir.1997) (same).

## II.

The following facts are drawn from Travelers' First Amended Complaint and related documents. All the documents considered in deciding Travelers' motion to dismiss are well within the scope of this court's review on a dismissal motion as they are incorporated into the complaint either by reference or through Travelers' reliance on them in making the allegations in the complaint. *See Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000). All Travelers' allegations have been accepted as true for the purpose of this motion, *see Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), and all reasonable inferences have been drawn in Travelers' favor, *see Thomas v. City of New York,* 143 F.3d 31, 37 (2d Cir.1998) (internal quotation marks and citation omitted).

Around November of 2000, CDL's parent company M & C engaged Willis of New York, Inc. ("Willis") as its insurance broker to procure property insurance coverage for the Millenium Hotels in the United States. (FAC ¶ 12). M & C authorized Willis to act as agent and representative for CDL in securing insurance coverage from Travelers for the Millenium Hilton in New York. (*Id.*) Willis solicited several insurers to participate in a layered property insurance program, with the primary coverage of $5 million to be provided by Lexington Insurance Company ("Lexington"). (*Id.* at ¶ 13) The first excess layer of coverage, for $5 million, was to be provided by Essex Insurance Company ("Essex") and Commonwealth Insurance Company ("Commonwealth") in the amount of $2.5 million each. (*Id.*) Willis sought to place Travelers in the second excess layer and requested coverage from Travelers with limits of $400 million per occurrence. (*Id.* at ¶ 14)

On November 13, 2000, Willis provided Travelers a copy of its standard property insurance policy form, called "WilProp," to show the coverage that Lexington would provide as primary insurance. (*Id.* at ¶ 15)

On December 11, 2000, Travelers proposed terms on which it would provide second excess layer coverage. (*Id.* at ¶ 16) Travelers' proposed terms included business interruption insurance with a one-year maximum limit on the period of indemnity and a 180–day maximum limit on the extended period of indemnity, or a total of 18 months. (*Id.* at ¶ 17) These terms differed from WilProp, which provided business interruption coverage for a three-year maximum period of indemnity and a one-year maximum period of extended indemnity. (*Id.* at ¶ 19) Travelers' proposal was to expire on January 1, 2001. (*Id.* at ¶ 18) On December 21, 2000, Travelers returned the Wilprop form, which CDL had provided to Travelers on November 13 as a draft of the primary policy, to CDL, with modifications to the wording, including changing the business interruption coverage terms to conform to Travelers' proposed terms—specifically, a one-year maximum limit on the period of indemnity and a 180–day maximum limit on the extended period of indemnity. (*Id.* at ¶¶ 15, 17, 23) In that same communication, Travelers requested a copy of the primary policy issued by Lexington once it was agreed upon. (*Id.*) On December 29, 2000, Travelers bound itself to provide coverage "per the terms and conditions" in Traveler's December 11 proposal, and a copy of the December 11 proposal was attached to Travelers' binder. (*Id.* at ¶ 25) Willis accepted the coverage terms proposed by Travelers without objection for the binder period, which would end upon issuance of the Travelers excess policy. (*Id.*)

Willis sent Travelers a second draft of the proposed Lexington primary policy on January 5, 2001. (*Id.* at ¶ 30) The business interruption provisions still differed from the terms proposed by Travelers, so Travelers returned the draft policy on January 12, 2001, after modifying the policy once again to conform to Travelers' proposed terms. (*Id.* at ¶¶ 31, 32) This was the last version of the primary policy language exchanged between Willis and Travelers until November 2001. (*Id.* at ¶ 32)

Willis representative Timothy Boyd met with Travelers representative James Coyle on January 26, 2001, and Boyd requested that Travelers extend its business interruption coverage from one year to three years for the period of indemnity and from 180 days to one year for the extended period of indemnity. (*Id.* at ¶ 34) Coyle refused, and later that day requested that Boyd notify him of additional "feedback" from Lexington so they could discuss the primary policy. (*Id.* at ¶¶ 34, 35) On February 1, 2001, Travelers agreed to leave the issue of lengths of time, including the period of indemnity and extended period of indemnity for business interruption coverage, to the primary policy language, but Travelers nevertheless expected Willis to seek to incorporate Travelers' changes to the business interruption coverage into the primary policy. (*Id.* at ¶ 38) At that time, Willis again requested an enlargement of the extended period of indemnity during policy negotiations and was again rebuffed by Travelers. (*Id.* at ¶ 39) In the same conversation, Travelers again requested a copy of the primary policy reflecting the changes Travelers had proposed relating to the business interruption coverage. (*Id.* at ¶ 38)

Travelers issued its excess insurance policy around February 7, 2001, in which it agreed to provide "Following Form coverage per the terms and conditions of the Primary Insurer(s) and/or Underlying Insurer(s) Insurance Policy(s)." (*Id.* at ¶ 40; Moukides Dec., Ex. E) On February 21, 2001, Travelers requested from Willis yet again what Travelers called the "final" primary policy, and asked whether that policy incorporated Travelers' proposed terms on the business interruption coverage. (FAC

¶ 42) Willis received from Lexington as early as March 9, 2001 a draft that would become the primary policy ultimately issued by Lexington, but did not send a copy of that primary policy to Travelers until after September 11, 2001. (*Id.* at ¶ 43) Around May 2001, Willis asked Lexington to agree to a three-year extended period of indemnity, rather than one year. (*Id.* at ¶ 44) Willis did not notify Travelers of this request. (*Id.*)

Around June 4, 2001, Travelers issued an endorsement to the excess policy to correct a mistake concerning the scope of the coverage. (*Id.* at ¶ 45) The original policy limited coverage to loss or damage caused only by "earthquake and flood." (Moukides Dec., Ex. E) The June endorsement eliminated this limitation. (*Id.*) The endorsement expressly "followed form" per the terms and conditions of the primary policy, just as the excess policy had all along. (*Id.*)

Travelers received a copy of the primary policy from Willis on November 1, 2001. (FAC ¶ 46) The primary policy Travelers received differs materially from Travelers' proposed terms in that the business interruption coverage is broader than the coverage Travelers proposed. (*Id.* at ¶ 46, 47)

The Millenium Hilton was damaged in the attack on the morning of September 11, 2001. (*Id.* at ¶ 48) CDL has presented insurance claims to Travelers for physical damage, business interruption and extra expenses under the primary, first excess, and second excess coverages. (*Id.* at ¶ 49) The insurers responsible for the initial $10 million of coverage have paid CDL their policy limits on the claims. (*Id.* at ¶ 50) Travelers has paid CDL more than $40 million for the claims. (*Id.* at ¶ 51) The parties dispute the terms of the coverage provided by Travelers and the remaining amount, if any, recoverable under that coverage. (*Id.* at ¶ 53) ·

## III.

### A. Claims for Declaratory Judgment

Travelers alleges that its December 11 proposal reflects the terms of the excess property policy it issued to CDL. (FAC ¶¶ 55, 61) As discussed above, these proposed terms included a one-year period of indemnity for the business interruption coverage and a 180–day extended period of indemnity for the business interruption coverage, or a total of 18 months. (*Id.* at ¶¶ 56, 62) The excess property policy Travelers issued is silent on business interruption coverage as Travelers had agreed to leave this issue to the primary policy and to "follow form". (Moukides Dec., Ex. E; FAC ¶ 38) Travelers claims that the excess policy was intended to follow the form of a primary policy that conformed to Travelers' proposed terms, and argues that the terms Travelers proposed during its negotiations with CDL reflect the actual terms of coverage, although these terms are not in either the excess policy issued by Travelers or the primary policy issued by Lexington. (*Id.* at ¶¶ 57, 63) Accordingly, Travelers seeks a two-part declaration: (1) that the maximum period of indemnity under the business interruption coverage provision is one year; and (2) that the maximum extended period of indemnity under the business interruption coverage is 180 days. (*Id.* at ¶¶ 59, 67)

#### 1. Travelers' First Claim for a Declaration of the Terms of Travelers' Coverage

Travelers alleges that because its excess policy was intended to follow the form of the primary policy, the excess policy would not become a fully integrated agreement until Lexington issued the primary policy. (FAC ¶ 57) Travelers concludes that because the primary policy was not issued

before September 11, 2001, the excess policy was not fully integrated at the time of loss, and thus Travelers' proposed terms and its binder reflect the agreement for coverage between the parties as of the time of loss. (*Id.*) Travelers' proposed terms and its binder are beyond the four corners of the excess policy and thus constitute parol evidence. Before this parol evidence can be considered in determining the terms of the parties' agreement, a threshold question must be addressed: was the excess policy a fully integrated agreement at the time of loss?

■■■ "Under New York law a contract which appears complete on its face is an integrated agreement as a matter of law." *Battery S.S. Corp. v. Refineria Panama, S.A.*, 513 F.2d 735, 738 n. 3 (2d Cir.1975). "Where the parties have reduced their agreement to an integrated writing, the parol evidence rule operates to exclude evidence of all prior or contemporaneous negotiations between the parties offered to contradict or modify the terms of their writing." *Marine Midland Bank–Southern v. Thurlow*, 53 N.Y.2d 381, 387, 442 N.Y.S.2d 417, 419–20, 425 N.E.2d 805 (1981); *see also Albany Savings Bank, FSB v. Halpin*, 117 F.3d 669, 672 (2d Cir.1997). The party relying on the rule to bar the admission of parol evidence must show that the writing completely and accurately embodies all of the mutual rights and obligations of the parties. *Lee v. Joseph E. Seagram & Sons, Inc.*, 413 F.Supp. 693, 700–01 (S.D.N.Y.1976), *aff'd*, 552 F.2d 447 (2d Cir.1977).

Whether the excess policy is a fully integrated agreement cannot be determined at this stage in the litigation. CDL emphasizes the provision in the excess policy agreement that states: "The complete policy consists of this Declarations and the excess Property Insurance form any [*sic*] endorsements attached." (Moukides Dec.,

Ex. E) CDL argues that this provision renders the excess policy form complete on its face because it expressly limits the scope of the agreement to the written documents enumerated. However, this provision cannot be read in isolation. The excess policy form further provides: "Except as provided herein, this policy provides Following Form coverage per the terms and conditions of the Primary Insurer(s) and/or Underlying Insurer(s) Insurance Policy(s)." (*Id.*) CDL itself argues that "following form" coverage means that the court must look beyond the excess policy to the primary policy to determine rights and obligations not specified in the excess policy. According to CDL, "follow form" means that Travelers "adopt[ed] all of the terms and conditions of the underlying Lexington policy, including Lexington's business interruption coverage." (Memorandum of Law in Support of Defendant CDL Hotels USA, Inc.'s Motion to Dismiss Travelers' First Amended Complaint ("Deft.Mem.") 1) However, the parties dispute whether Lexington issued the primary policy before the loss and even whether the primary policy had to be issued before the loss in order for Travelers to be bound by it.

■■■ This latter dispute raises a question of law, one which the Court of Appeals recently addressed in a case substantially similar to this one. In *World Trade Center Properties, LLC v. Hartford Fire Ins. Co.*, 345 F.3d 154 (2d Cir.2003), the Court dealt with the destruction of the World Trade Center in the same September 11, 2001 attack that damaged the Millenium Hilton. *Id.* at 158. The Court held that none of the insurers could be bound by a policy that had not been issued as of September 11, 2001. *Id.* at 167–68. In this case, unless Lexington issued the primary policy by September 11, 2001, Travelers cannot be bound by the terms of the Lex-

ington policy. The question of when the primary policy was issued is a question of material fact that is in dispute, and thus cannot be resolved on a motion to dismiss. Travelers' allegation that no primary policy was issued prior to September 11, 2001 must be accepted as true for the purpose of deciding this motion to dismiss, *see Leatherman*, 507 U.S. at 164, 113 S.Ct. 1160, and the allegation is sufficient to defeat a motion to dismiss.

Further, even if it could be determined that Lexington issued a primary policy before September 11, 2001, the law requires that the policy have been at least available for review by Travelers in order to bind Travelers. 345 F.3d at 168. However, the parties also dispute whether a primary policy—assuming *arguendo* that one had been issued before September 11, 2001—was available to Travelers for review before the time of loss. This, too, raises a question of material fact that cannot be resolved on a motion to dismiss. Travelers' allegation that the policy was never available for review must be accepted as true for the purpose of deciding this motion to dismiss, *see Leatherman*, 507 U.S. at 164, 113 S.Ct. 1160, and the allegation is sufficient to state a claim for relief.

Accordingly, CDL's motion to dismiss Travelers' first claim for a declaratory judgment as to the terms of its coverage is denied.

### 2. Travelers' Second Claim for a Declaration of the Contract Terms and Rights Thereunder.

Item 6 of Travelers' excess policy provides, in relevant part: "[I]f there is any change in the scope of coverage under the Primary and/or Underlying Policy(s), the insurance afforded under this agreement shall then apply in the same manner as though the Primary and/or Underlying Policy(s) had been so maintained and un-

changed." (Moukides Dec., Ex. E) Travelers alleges that CDL, through its agent Willis, effectively agreed to Travelers' proposed terms concerning business interruption coverage by CDL's "acceptance without modification of Travelers' January 12, 2001 amendments [to a draft of the Lexington primary policy], and its failure thereafter to provide to Travelers prior to the September 11, 2001 loss a draft or final primary policy differing from the January 12, 2001 amendments...." (FAC ¶ 65) Therefore, according to Travelers, the primary policy issued by Lexington constitutes a change in the scope of coverage under the primary policy inasmuch as that primary policy provides broader coverage than CDL had agreed the primary policy would provide, and per the terms of the excess policy, Travelers' coverage must be determined as if the primary policy were unchanged.

■ Travelers' argument fails for two reasons. First, Travelers has failed to show that CDL agreed to Travelers' January 12, 2001 amendments, and thus Travelers has not shown any change in the primary policy issued by Lexington. Travelers argues that CDL's silence in response to Travelers' January 12, 2001 amendments to the draft primary policy constituted agreement to Travelers' amendments, but "it is a well settled rule that assent cannot be read into a party's silence in response to another party's assertion unless silence would have a tendency to mislead." *World Trade Center*, 345 F.3d at 173. Given CDL's repeated requests for broader business interruption coverage, Travelers could hardly have been misled into believing that CDL had abandoned its desire for broader business interruption coverage simply because it did not respond immediately to Travelers' amendments. Travelers itself alleges that on January 26, 2001, and again on Febru-

ary 1, 2001, CDL reiterated its requests that Travelers extend its business interruption coverage. (FAC ¶¶ 34, 38, 39) These requests came after Travelers submitted its proposed amendments to Lexington's draft primary policy on January 12 and before Travelers issued its excess policy on February 7, (*id.* at ¶¶ 31, 32, 40), and show that Travelers knew that CDL was dissatisfied with Travelers' proposed amendments before Travelers issued its excess policy following the form of the primary policy. Travelers' own allegations also show that on February 21, 2001—two weeks after issuing its excess policy on February 7 and more than one month after submitting its proposed amendments to the draft primary policy to CDL on January 12—Travelers asked CDL whether the primary policy incorporated Travelers' proposed terms on the business interruption coverage. (*Id.* at ¶ 42) This inquiry shows that Travelers believed that the scope of business coverage was still unresolved even after it issued its excess policy on February 7; otherwise, there would have been no reason to make the inquiry. Therefore, Travelers could not reasonably have believed that CDL had agreed to Travelers' proposed amendments to Lexington's draft primary policy. Indeed, Travelers' argument is belied by its own allegations.

The second reason Travelers' argument fails is that, even assuming *arguendo* that CDL could be found to have accepted Travelers' amendments to the draft primary policy, CDL could not unilaterally dictate the terms of the primary policy to be issued by Lexington. Ultimately, Lexington had to agree to the terms of the primary policy as well. *See Advanced Marine Technologies, Inc. v. Burnham Securities, Inc.,* 16 F.Supp.2d 375, 380 (S.D.N.Y.1998) ("Absent a mutual intention to be bound, there can be no contract."); *Ciaramella v. Reader's Digest Ass'n, Inc.,*

131 F.3d 320, 322 (2d Cir.1997) ("Under New York law, ... if the parties intend not to be bound until the agreement is set forth in writing and signed, they will not be bound until then."). There is no allegation that Lexington ever agreed to Travelers' proposed terms or was even aware of these terms, nor is there any allegation that Travelers believed Lexington had agreed or would agree to Travelers' proposed terms. In fact, as discussed above, Travelers inquired on February 21, 2001 as to whether the primary policy incorporated Travelers' proposed terms for the business interruption coverage, (FAC ¶ 42), which shows that as of February 21—two weeks after Travelers had issued its excess policy following the form of the primary policy—Travelers still did not know whether Lexington had agreed to Travelers' proposed terms. Without an agreement from Lexington to incorporate Travelers' proposed terms into the primary policy, Travelers could not reasonably have believed that Lexington's primary policy would reflect the narrower business interruption coverage Travelers proposed.

Because CDL did not agree to incorporate Travelers' proposed terms into Lexington's primary policy, or because CDL could not unilaterally incorporate Travelers' proposed terms into Lexington's primary policy, the terms of the primary policy issued by Lexington must be compared to the terms of the last draft primary policy reviewed by Travelers—rather than to Travelers' proposed terms—in determining whether there was a change in the terms of the primary policy as Travelers understood it. In other words, if the business interruption coverage is the same in the primary policy issued by Lexington as in the last draft of the primary policy reviewed by Travelers, then there was no change in the primary policy that would

engage item 6 of Travelers' excess policy. Travelers own allegations show that there was, in fact, no change in the business interruption coverage from the draft primary policy last reviewed by Travelers to the primary policy issued by Lexington. Travelers itself alleges that both draft primary policies it received before issuing its excess policy ·provided the broader business interruption coverage ultimately reflected in the primary policy issued by Lexington. (FAC at ¶¶ 15, 23, 30–32) Therefore, accepting Travelers' allegations as true, item 6 of Travelers' excess policy is inapplicable to this action because there was no change in the terms and conditions of the primary policy. Accordingly, CDL's motion to dismiss Travelers' second claim for a declaratory judgment as to the contract terms and rights thereunder is granted.

### 3. Breach of Implied Covenant of Good Faith and Fair Dealing

Travelers alleges that CDL ·breached its duty of good faith and fair dealing when it "failed timely to provide Travelers with a copy of the Lexington primary policy, and attempted unilaterally to enlarge the scope of coverage Travelers would provide by enlarging the period of indemnity and extended period of indemnity to include time periods broader than Travelers had agreed to cover." (FAC ¶ 70) Travelers claims that CDL failed "to obtain revisions to the Lexington Policy language to render it concurrent with Travelers' agreement to provide coverage" and that CDL's failure has "denied Travelers the benefit of its bargain with CDL." (*Id.* at ¶ 72) In short, Travelers argues that CDL was obligated, pursuant to a duty of good faith and fair dealing implied in a contract between Travelers and CDL, to negotiate terms in the primary policy that CDL knew would be acceptable to Travelers.

"In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance." *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153, 746 N.Y.S.2d 131, 135, 773 N.E.2d 496 (2002); *see also Dalton v. Educational Testing Service*, 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 979, 663 N.E.2d 289 (1995). However, there can be .no breach of the duty of good faith and fair dealing where there is no "valid and binding contract from which such a duty would arise." *American–European Art Assocs., Inc. v. Trend Galleries, Inc.*, 227 A.D.2d 170, 171, 641 N.Y.S.2d 835, 836· (1st Dep't 1996) (dismissing cause of action for breach of the duty of good .faith and fair dealing after finding that no contract existed); *see also Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir.1992) (holding that the determination that no contract existed disposed of cause of action for breach of the duty of good faith and fair dealing).

The only contract between Travelers and CDL in effect on September 11, 2001, was Travelers' excess property insurance policy. According to Travelers' own allegations, its binder was no longer in effect on September 11, 2001. "It has long been settled in [New York] that an insurance binder is a temporary or interim policy until a formal policy is·issued. A binder provides interim insurance, usually effective as· of the ·date of application, which terminates when a policy is either issued or refused." *Springer v. Allstate Life Ins. Co.*, 94 N.Y.2d 645, 649, 710 N.Y.S.2d 298, 731 N.E.2d 1106 (2000). Under New York law, Travelers' binder terminated on February 7, 2001, when· Travelers issued its final excess policy, and the excess policy became the only operative contract between the parties. (FAC ¶ 40) Therefore, any· duty of good faith and fair dealing owed to Travelers by CDL would have to

have arisen from the excess policy agreement or not at all.

■ "New York law ... does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life and Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002); *see also New York Univ. v. Continental Insurance Co.*, 87 N.Y.2d 308, 320, 639 N.Y.S.2d 283, 290, 662 N.E.2d 763 (1995) (dismissing claim for breach of the duty of good faith and fair dealing as duplicative of claim for breach of contract). Travelers also has asserted a cause of action for breach of contract, claiming that CDL breached the terms of the excess policy agreement. (FAC ¶¶ 90–102) Travelers' breach of contract claim is based upon precisely the same allegations that underlie its claim for breach of the covenant of good faith and fair dealing, (*id.*), and as discussed above, any duty of good faith and fair dealing would have to have arisen from the excess policy agreement. Therefore, Travelers' claim for breach of the covenant of good faith and fair dealing must be dismissed as duplicative of its breach of contract claim.

■ Travelers' claim for breach of the duty of good faith and fair dealing would also fail on the merits. The duty in question "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton*, 87 N.Y.2d at 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (internal quotation marks omitted). "[T]he implied covenant of good faith and fair dealing is limited to performance under a contract and does not encompass future dealings or negotiations between the parties.... [I]t does not obligate the promisor to make future promises." *Bank of N.Y. v. Sasson*,

786 F.Supp. 349, 354 (S.D.N.Y.1992). "Moreover, so long as the promisee is allowed to reap the benefits of the contract, the implied covenant of good faith does not require the promisor to take actions contrary to his own economic interest...." (*Id.*) "[T]he implied covenant does not extend so far as to undermine a party's 'general right to act on its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract." *M/A–COM Security Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir.1990).

Travelers' allegation that CDL attempted to enlarge the scope of the business interruption coverage in the primary policy does not allege a breach of the duty of good faith and fair dealing. Even though Travelers had agreed to "follow form," Travelers could not be bound by the primary policy without an opportunity to review and accept it. *See World Trade Center*, 345 F.3d at 167–68. Therefore, CDL's dealings with Lexington could not "have the effect of destroying or injuring" Travelers' rights under the excess policy agreement. *See Dalton*, 87 N.Y.2d at 389, 639 N.Y.S.2d 977, 663 N.E.2d 289. Travelers need only have refused to follow Lexington's primary policy form after reviewing it, and then either terminated the excess coverage entirely or issued an endorsement to the excess policy specifying Travelers' own terms for the excess business interruption coverage. Indeed, Travelers was not opposed to modifying its excess policy by endorsement. As already discussed, *see supra* pp. 488–89, Travelers issued an endorsement in June 2001 modifying the scope of coverage in the excess policy to correct a mistake that had limited coverage to loss or damage caused only by "earthquake and flood." (Moukides Dec., Ex. E) The June endorsement withdrew that limitation and reiterated that the excess policy would follow the form of the

primary policy. (*Id.*) Therefore, because Travelers was to have the opportunity to review the primary policy and determine whether to accept it, any deviation in the terms of the primary policy from Travelers' expectations would be the subject of "future dealings ·or negotiations between the parties" and thus not within the scope of the duty of good faith and fair dealing. *See Bank of N.Y.*, 786 ·F.Supp. at 354.

Further, CDL was not obligated "to take actions contrary to its own economic interest." *Id.* CDL was free to negotiate broader business interruption coverage under the primary policy and subsequently negotiate narrower coverage under the excess policy, rather than being compelled to agree to the narrower coverage at both levels. CDL was not obligated "to obtain revisions to the Lexington Policy language to render it concurrent with Travelers' agreement to provide coverage," (FAC ¶ 72), because Travelers' agreement to provide coverage was not necessarily controlled by Lexington's agreement. As already discussed, Travelers was to have the opportunity to review the primary policy and determine whether to accept it before being bound by it.

■ Finally, "[a] claim for breach of the implied covenant of good faith and fair dealing cannot substitute for an unsustainable breach of contract claim." *Skillgames, LLC v. Brody*, 767 N.Y.S.2d 418, 423, 1 A.D.3d 247, 247 (1st Dep't 2003). As discussed below, *see infra* pp. 504–05, Travelers' breach of contract claim is itself unsustainable, and therefore so is its claim for breach of the implied covenant of good faith and fair dealing.

Accordingly, CDL's motion to dismiss Travelers' claim for a declaratory judgment based upon an implied covenant of good faith and fair dealing is granted.

## B. Claims for Reformation or Rescission

Travelers alleges, in the alternative, that if the court finds that the actual terms of Travelers' excess coverage differ from Travelers' proposed terms and the terms of Travelers' binder, then any difference in these terms is the product of mistake. (FAC ¶¶ 74, 81, 97) According to Travelers, Willis understood that Travelers would agree to "a maximum business interruption period of indemnity of one year, and a maximum extended period of indemnity of 180 days." (*Id.* at ¶¶ 77, 82) Travelers alleges that its position was reflected in its proposed terms, its binder, and its January 12, 2001 amendments to the draft primary policy form. (*Id.*) Travelers claims that its excess policy "mistakenly appears to reflect terms of insurance coverage different from those that Travelers agreed it would provide to CDL" when "the follow form language in the Travelers policy" is "read in conjunction with the Lexington primary form" because the primary form provides broader coverage than Travelers agreed to provide. (*Id.* at ¶ 75) Travelers argues that the excess policy agreement should be reformed to reflect what it claims is the parties' actual agreement, which would provide (1) that the maximum period of indemnity under the business interruption coverage provision is one year, and (2) that the maximum extended period of indemnity under the business interruption coverage is 180 days, or that the agreement should be rescinded altogether. (*Id.* at ¶¶ 79, 95, 98)

■ Reformation or rescission may be appropriate where a writing does not set forth the actual agreement of the parties. *See Chimart Assoc. v. Paul*, 66 N.Y.2d 570, 573, 498 N.Y.S.2d 344, 344, 489 N.E.2d 231 (1986). However, reformation and rescission have been limited both substantively and procedurally to avoid "the danger that a party, having agreed to a

written contract that turns out to be disadvantageous, will falsely claim the existence of a different [ ] contract." *Id.* "Procedurally, there is a heavy presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties, and a correspondingly high order of evidence is required to overcome that presumption." *Id.* at 574, 498 N.Y.S.2d 344, 489 N.E.2d 231 (internal citation and quotation marks omitted); *see also Collins v. Harrison–Bode,* 303 F.3d 429, 435 (2d Cir.2002) (requiring "clear and convincing evidence"); *Barclay Arms, Inc. v. Barclay Arms Assoc.,* 74 N.Y.2d 644, 646, 542 N.Y.S.2d 512, 513–14, 540 N.E.2d 707 (1989) ("[T]he right to reformation must be demonstrated by clear, positive and convincing evidence"); *The West 90th Owners Corp. v. Schlechter,* 165 A.D.2d 46, 50, 565 N.Y.S.2d 9, 12 (1st Dep't 1991) (refusing to permit reformation or rescission where defendant failed to satisfy the "very high order of proof").

▮ Substantively, neither reformation nor rescission is permitted if the parties entered an agreement based upon uncertain or contingent events and the claim is based upon mistake as to the outcome of such an event. *See Chimart,* 66 N.Y.2d at 574, 498 N.Y.S.2d 344, 489 N.E.2d 231 (citing *Sears v. Grand Lodge,* 163 N.Y. 374, 378, 57 N.E. 618 (1900)); *Beecher v. Able,* 441 F.Supp. 426, 430 (S.D.N.Y.1977) (denying rescission where plaintiff claimed mistake as to a fact uncertain at the time of agreement).

▮ As already discussed, Travelers alleges that Lexington had not issued the primary policy as of February 7, 2001, when Travelers and CDL entered into the excess policy agreement, and indeed Lexington may not have issued the primary policy until as late as November 2001, after Travelers' June endorsement and after the time of loss, according to Travelers.

Travelers also alleges that it agreed to "follow form" as to the terms of the primary policy concerning, among other things, business interruption coverage for the Millenium Hotel. Travelers contends that the parties understood that Travelers' business interruption coverage under its excess policy agreement was contingent upon the primary policy incorporating the same terms reflected in Travelers' proposal and its binder.

Accepting Travelers' allegations as true, Travelers and CDL purposely contracted based upon an uncertain or contingent event—namely, whether Lexington would incorporate Travelers' proposed terms into the primary policy. Had Lexington issued a primary policy before Travelers and CDL entered into the excess policy agreement, the actual terms of the primary policy would have been certain and fixed at the time of Travelers' and CDL's agreement, and thus no uncertainty or contingency would have existed in the excess policy agreement. However, because Travelers and CDL entered into the excess policy agreement before Lexington issued its primary policy, and because the excess policy agreement was contingent upon the terms of Lexington's primary policy, neither reformation nor rescission of the excess policy agreement is permitted under New York law. *See Chimart,* 66 N.Y.2d at 574, 498 N.Y.S.2d 344, 489 N.E.2d 231.

Travelers' claims fail for additional reasons. Travelers alleges that the excess policy agreement should be reformed or rescinded based upon either mutual mistake or unilateral mistake. Neither basis is sufficient for relief on the allegations in Travelers' First Amended Complaint.

**1. Mutual Mistake**

Travelers claims that both parties "mistakenly believed that Travelers' issuance

of its excess follow form would give effect to the terms of the parties' agreement for coverage set forth in the December 11, 2000 proposal and the December 29, 2000 binder." (FAC ¶ 78) Travelers asserts that it did not realize the mistake in coverage until November 2001, when it first learned that Lexington had issued a primary policy. (*Id.*)

New York law permits reformation or rescission of a contract for mutual mistake. *AMEX Assurance Co. v. Caripides,* 316 F.3d 154, 161 (2d Cir.2003); *Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991). "As used in the doctrine of mutual mistake, mistake means being in error in one's belief as to what the contract states." *Id.* at 162 (internal quotation marks omitted). In *AMEX,* although the insured was mistaken in his belief about the terms of the insurance policy, the Court of Appeals found that there was no mutual mistake because the, insurer knew what the policy provided. *Id.* at 161. The Court held that reformation was not permitted. *Id.* at 162.

Although the tables are turned here as between insurer and insured, the Court's holding in *AMEX* is on point. Travelers may have been mistaken about the scope of coverage in the primary policy—and hence the coverage as to which the excess policy followed form—but CDL was well aware of what the primary policy provided. According to Travelers' own allegations, as early as March 9, 2001, Willis, acting as CDL's agent, received a copy of what would become the primary policy issued by Lexington. (FAC ¶ 43). This primary policy provided for broader business interruption coverage than had been provided in Travelers' binder. (*Id.* at ¶ 46, 47) Accepting Travelers' allegations as true, CDL was well aware of "what the contract states" long before and after September 11, 2001, and thus any mistake

here as to the terms of insurance coverage was Travelers'. Just as in *AMEX,* this is not mutual mistake, and therefore neither reformation nor rescission of the contract for mutual mistake would be appropriate under New York law. 316 F.3d at 161–62.

Further, rescission is appropriate only "when the parties have made a mutual mistake as to a fact or assumption which goes to the heart of the agreement." *Beecher,* 441 F.Supp. at 430. In *Beecher,* a class action, the defendant had agreed to deposit money in a fixed settlement fund to be paid out to claimants. *Id.* at 428. The parties ultimately found that they had substantially over-estimated the number of claimants who would come forward, and the defendant sought to rescind the settlement based upon mistake. *Id.* The Court held that rescission was inappropriate because the "error would only be a matter of degree and would not got to the 'heart of the agreement.'" *Id.* at 430. Here, Travelers does not dispute that it agreed to provide excess property insurance or specifically business interruption coverage. Travelers claims only that it expected to provide coverage for a shorter period. Just as in *Beecher,* any error here is merely a matter of degree—the length of time to be covered—and does not go to the heart of the agreement. Therefore, rescission of the excess policy agreement is not appropriate.

Accordingly, CDL's motion to dismiss Travelers' claim for reformation or rescission based upon mutual mistake is granted.

### 2. Unilateral Mistake

Travelers alleges that it "believed that Willis had presented the terms of the Travelers proposal and binder—including the one year period of indemnity and 180 day extended period of indemnity—to Lex-

ington for incorporation into the Lexington primary policy form." (FAC ¶ 83) Travelers further alleges that "Willis was aware of Travelers' belief that Willis was seeking to incorporate the terms of the Travelers binder into the Lexington primary policy. . . ." (*Id.*) According to Travelers, despite its request that its proposed terms and amendments to the draft primary policy be relayed to Lexington, "Willis never sought to alter the period of indemnity and/or extended period of indemnity in the Lexington primary policy form such that periods would conform to the coverage that Travelers had agreed to provide in its proposal and binder," and "Willis never informed Travelers that its coverage terms were not forwarded to or discussed with Lexington." (*Id.* at ¶ 85) Travelers claims that its mistaken belief about Willis' negotiations with Lexington constitutes a unilateral mistake that permits reformation or rescission of the excess policy agreement. (*Id.* at ¶ 80)

■ New York law does not permit reformation or rescission of a contract for unilateral mistake alone. *See Collins,* 303 F.3d at 435. A unilateral mistake must be "coupled with some fraud." *Allen,* 945 F.2d at 44; *see also AMEX,* 316 F.3d at 161 (holding that reformation requires "a mistake on one side, and fraud on the other"); *Barclay Arms, Inc. v. Barclay Arms Assoc.,* 74 N.Y.2d 644, 646, 542 N.Y.S.2d 512, 513–14, 540 N.E.2d 707 (1989) ("A bare claim of unilateral mistake by plaintiff, unsupported by legally sufficient allegations of fraud on the part of defendants, does not state a cause of action for reformation."); *Brandwein v. Provident Mutual Life Ins. Co. of Philadelphia,* 3 N.Y.2d 491, 496, 168 N.Y.S.2d 964, 964, 146 N.E.2d 693 (1957) (holding that reformation or rescission is permitted when there is "unilateral mistake plus fraud"); *Reliance v. American Electric Power Co.,*

*Inc.,* 236 A.D.2d 296, 296, 654 N.Y.S.2d 9, 10 (1st Dep't 1997) (holding that reformation requires that plaintiff's unilateral mistake must have been induced by defendant's inequitable conduct, the standard for which is fraud); *Best v. Yutaka,* 231 A.D.2d 539, 539, 646 N.Y.S.2d 995, 998 (2d Dep't 1996) (holding that unilateral mistake by itself is not sufficient to invalidate a contract); *The West 90th Owners Corp. v. Schlechter,* 165 A.D.2d 46, 50, 565 N.Y.S.2d 9, 12 (1st Dep't 1991) (refusing to permit reformation or rescission where conclusory allegations were insufficient to prove unilateral mistake and fraud); *Leavitt–Berner Tanning Corp. v. American Home Assurance Co.,* 129 A.D.2d 199, 201–02, 516 N.Y.S.2d 992, 994 (3d Dep't 1987) (holding that reformation requires a showing of "unilateral mistake coupled with fraud"); *Surlak v. Surlak,* 95 A.D.2d 371, 380–82, 466 N.Y.S.2d 461, 469–70 (2d Dep't 1983) (holding that reformation requires "fraudulently induced, unilateral mistake").

■ "Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wynn v. AC Rochester,* 273 F.3d 153, 156 (2d Cir.2001); *see also Barclay,* 74 N.Y.2d at 646–47, 542 N.Y.S.2d 512, 540 N.E.2d 707 (holding that "the essential elements of a fraud claim" are "misrepresentation of a material fact, falsity, scienter and deception"). "To establish fraudulent concealment, a plaintiff must also prove that the defendant had a duty to disclose the material information." *Banque Arabe et Internationale D'Investissement v. Maryland National Bank,* 57 F.3d 146, 153 (2d Cir.1995). "Fed.R.Civ.P. 9(b) requires that allegations of fraud be

pled with specificity," except scienter "may be averred generally." *Carter–Wallace, Inc. Securities Litigation,* 220 F.3d 36, 39 (2d Cir.2000); *see also* Fed.R.Civ.P. 9(b). Further, as discussed above, "[u]nder New York law, each element of a fraud claim must be proven by clear and convincing evidence." *Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 784–85 (2d Cir. 2003). Travelers has failed to allege each of the elements of fraud necessary to support its claim for unilateral mistake.

### a. Misrepresentation or Omission of Material Fact

Travelers argues that "Willis was under a duty to disclose" the terms of the final primary policy to Travelers because Willis was aware that Travelers mistakenly believed "that Willis was seeking to incorporate terms consistent with the Travelers proposal and binder into the Lexington primary policy." (FAC ¶ 86) Travelers claims that Willis' failure to disclose "that it had never sought to conform the terms of the Lexington primary policy" to Travelers' proposed terms is material. (*Id.* at ¶ 88) Travelers argues that it was denied "the opportunity to issue prior to the loss a correcting amendment or endorsement to its policy to reflect the fact that, irrespective of the terms of the Lexington policy, the Travelers policy covered a one year period of indemnity and 180 days of extended period of indemnity." (*Id.* at ¶ 91) Travelers contends that "it would not have issued the excess follow form policy that it did issue" had it known that Willis would make no attempt to conform the primary policy terms to Travelers' proposed terms. (*Id.* at ¶ 88)

"[W]hen dealing with a claim of fraud based on material omissions, it is settled that a duty to disclose arises only when one party has information that the other party is entitled to know because of

a fiduciary or other similar relation of trust and confidence between them." *United States v. Szur,* 289 F.3d 200, 211 (2d Cir.2002). "When parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." *In re Mid–Island Hospital, Inc.,* 276 F.3d 123, 130 (2d Cir.2002). However, there may be a relationship of trust and confidence sufficient to give rise to a duty to disclose under the "special facts doctrine." "Under that doctrine, a duty to disclose arises where one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair." *P.T. Bank Central Asia v. ABN AMRO Bank N.V.,* 301 A.D.2d 373, 378, 754 N.Y.S.2d 245, 252 (1st Dep't 2003). The plaintiff must prove that "(1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second party is acting on the basis of mistaken knowledge." *Banque Arabe,* 57 F.3d at 155.

Travelers has failed to show that CDL had "superior knowledge" that was not "readily available" to Travelers concerning the primary policy when Travelers entered into the excess policy agreement with CDL. Travelers alleges that CDL provided Travelers with a draft of the primary policy form on two separate occasions—first on November 13, 2000, and again on January 5, 2001—and both drafts contained the broader business interruption coverage reflected in the primary policy ultimately issued by Lexington. (FAC ¶¶ 15, 30) Therefore, Travelers not only knew of the proposed terms of the primary policy before Travelers issued its excess policy in February of 2001, but also had received at least two drafts that did not

conform to what Travelers now claims were its wishes and expectations. Further, Travelers has not pointed to any— much less material—information known to CDL when Travelers issued its excess policy that was not known to Travelers at that time.

Travelers also has failed to allege facts sufficient to show that CDL knew that Travelers was laboring under a mistaken belief. Travelers alleges that it asked Willis to relay its proposed terms to Lexington, but there is no allegation that Willis or CDL ever agreed to relay these terms to Lexington, to make any attempt at all to incorporate these terms into the primary policy, or to notify Travelers if that attempt was unsuccessful.[1] In fact, Travelers alleges that Willis repeatedly requested that it agree to the broader business interruption coverage provided in the draft primary policy form, which should have alerted Travelers that CDL was seeking the broader coverage at the primary level as well. Additionally, the last word from Travelers on the primary policy form, and specifically addressing the scope of the business interruption coverage, came on February 21, 2001, (FAC ¶ 42), months before Travelers' June endorsement of the excess policy where Travelers agreed to "follow form," (id. at ¶ 45). When CDL did not hear any further objections to or even mention of the primary policy form, or more specifically the business interruption coverage, at the time Travelers again agreed to "follow form" in June 2001, it was certainly reasonable for CDL to have concluded that Travelers no longer objected to the broader business interruption coverage provided in the draft primary policy form, or at least that Travelers had

no particular expectation as to what the terms of Lexington's primary policy would be. CDL was further justified in not making a particular effort to alert Travelers to the business interruption coverage in the primary policy because it knew that Travelers would have an opportunity to review the primary policy before being bound by it and could then make any endorsements necessary to conform the excess policy to its proposed terms. *See World Trade Center*, 345 F.3d at 168. Travelers' claims that CDL knew that Travelers was acting on a mistaken belief are nothing more than conclusory allegations unsupported by facts. Conclusory allegations are not sufficient to state a claim for fraud. *See Carter–Wallace*, 220 F.3d at 39; *West 90th*, 165 A.D.2d at 50, 565 N.Y.S.2d 9.

Apparently recognizing this deficiency in its First Amended Complaint, Travelers has moved belatedly to amend its complaint a second time. Travelers now alleges that the premiums paid by CDL for the excess property insurance coverage were calculated based on business interruption' coverage for only one-year indemnity and 180–day extended indemnity, and that CDL knew this. (Plaintiff Travelers Indemnity Company of Illinois' Opposition to Defendant CDL Hotels USA, Inc.'s Motion to Dismiss the First Amended Complaint ("Pl. Opp.") 5) According to Travelers:

> Because Travelers insisted that, under the Travelers Time Limits, it would provide business interruption coverage for no longer than one year, it asked Willis to report the business interruption values initially reported by CDL. Willis then submitted values for one year. The premium percentage rate was ap-

---

**1.** Even if Travelers were to have alleged that CDL agreed to relay Travelers proposed terms to Lexington for incorporation into the primary policy, CDL's promise would still not constitute fraud because it would be "merely a statement of intent to perform under the contract, [which] cannot constitute fraud in New York." *Manning v. Utilities Mutual Ins. Co., Inc.*, 254 F.3d 387, 401 (2d Cir.2001).

plied to these lower values rather than the higher three year values in order to arrive at a premium. CDL paid the premium for the Travelers insurance coverage.

(*Id.*) From these facts Travelers would have a factfinder conclude that CDL knew not only that Travelers believed Willis would seek to incorporate the narrower business interruption terms reflected in Travelers' binder into the primary policy, but also that CDL was not paying Travelers for the broader coverage actually provided in the primary policy issued by Lexington and thus provided by Travelers in following the Lexington form.

Travelers' motion to amend its First Amended Complaint to incorporate these new allegations is granted.[2] However, these belated allegations are not enough to save Travelers' claim. The most that these new allegations show is that CDL should have known that the excess policy issued by Travelers would not provide more than one-year indemnity and 180–day extended indemnity, but this has no bearing on the terms of the primary policy because, regardless of the coverage provided in the primary policy, CDL knew that Travelers would have the opportunity to limit the coverage in the excess policy by endorsement if the primary policy were to deviate from Travelers' expectations. *See World Trade Center*, 345 F.3d at 168. Therefore, accepting these new allegations as true for the purposes of the instant motion, CDL likely knew what its coverage would be under Travelers' excess policy, through its premiums and agreement with Travelers, but it had no reason to know that Travelers believed that the primary policy would, in fact, incorporate Travelers' terms. Indeed, Travelers has not even alleged that it so believed, but only

that it believed CDL would "seek" or "attempt" to incorporate its terms into the primary policy, with no alleged guarantee that CDL would succeed in doing so.

Here it is important to understand precisely what information Travelers claims it was mistaken about and that CDL was obligated to disclose. Travelers claims that it was mistaken in its belief that Willis would relay its proposed terms to Lexington in an *attempt* to incorporate these terms into the primary policy and that CDL was obligated to disclose that Willis had not made any such *attempt*. Travelers never alleges that it believed that the primary policy issued by Lexington incorporated its proposed terms. Indeed, Travelers does not allege that it had any belief at all as to what the actual terms of the primary policy were or even would be when issued by Lexington. Travelers alleges only that it believed Willis was "seeking" or "attempting" to incorporate Travelers' proposed terms into the primary policy. (FAC ¶¶ 82, 83, 85–90, 92, 95) Again, the mistake at issue here is not over the actual terms of the primary policy, but merely over how Willis negotiated these terms with Lexington.

Finally, Travelers' unilateral mistake claim requires a showing that the primary policy was made available to Travelers for review because Travelers would not be bound by it otherwise. As already discussed, New York law requires that the primary policy be available for review by Travelers before CDL could enforce the terms of the primary policy against Travelers under "follow form" coverage. *See World Trade Center*, 345 F.3d at 168. If, as Travelers alleges, the primary policy were not available for review by Travelers, then the terms of the primary policy can-

2. The terms, including attorneys fees, upon which Travelers' motion to amend its First Amended Complaint is granted will be decided later at a conference with the parties.

not be part of CDL's excess policy agreement with Travelers, in which case Travelers' unilateral mistake claim is moot. *See Id.* Therefore, Travelers' unilateral mistake claim can be considered only in a setting where the primary policy was available for review by Travelers, in which case there can have been no misrepresentation or omission of material fact because the actual terms of the primary policy would have been available to Travelers before Travelers would be bound. *See Wynn,* 273 F.3d at 156 ("Where a plaintiff has the means of knowing, by the means of ordinary intelligence, the truth of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations."). In short, either Travelers had no opportunity to review the primary policy and thus its unilateral mistake claim is moot, *see World Trade Center,* 345 F.3d at 168, or Travelers did have an opportunity to review the policy and thus there was no misrepresentation or omission of material fact, *see Carter–Wallace,* 220 F.3d at 39.

Travelers has failed to show not only that CDL had a duty to disclose, but also that there was any material information known to CDL but not known to Travelers when Travelers issued its excess policy.[3] Therefore, Travelers has failed to allege a misrepresentation or omission of material fact.

### b. Scienter

Travelers claims that Willis understood that disclosing the actual terms of the primary policy "could lead to Travelers limiting the coverage it would offer, or withdrawing its offer to provide coverage altogether, would endanger the issuance by Travelers of its excess policy, and potentially the entire Millenium multi-layer insurance program." (FAC ¶ 87) Travelers further asserts that "after the policy effective date of January 1, 2001, [Willis] did not have any conversations with insurers other than Travelers that could have provided coverage had Travelers refused to continue its participation in the second excess layer," and therefore Willis had a motive to conceal the actual terms of the primary policy issued by Lexington from Travelers to ensure excess coverage—as well as to secure broader excess coverage through "follow form" coverage than it otherwise would have received. (*Id.*)

 Under New York law, the scienter element of fraud requires that the plaintiff "demonstrate that the defendant made a false representation which was either known to be untrue or made with reckless disregard of its truth and which was made with the intent to deceive and to induce the plaintiff to part with or refrain from obtaining something of value, thereby causing injury." *Melia v. Riina,* 204 A.D.2d 955, 956, 612 N.Y.S.2d 506, 508 (3d

---

**3.** To the extent Travelers claims that CDL's conduct or knowledge after the parties entered into the excess policy agreement serves as the basis for some misrepresentation or omission of material fact—*e.g.,* CDL did not disclose to Travelers *after Travelers issued its excess policy* that CDL was not seeking to incorporate Travelers' proposed terms into the primary policy—Travelers' claims fail. Unilateral mistake may permit reformation or rescission of a contract only where the contract is *induced* by fraud—*i.e.,* the fraud must occur at or before the time the parties enter

into the agreement. *See Wynn,* 273 F.3d at 156 (holding that plaintiff must show that defendant induced plaintiff into the contract); *Reliance,* 236 A.D.2d at 296, 654 N.Y.S.2d at 10 (holding that plaintiff's unilateral mistake must have been induced by defendant's fraud). Obviously, a party cannot claim that it was induced into a contract on the basis of fraud by the other party to the contract when the misrepresentation or omission underlying the purported fraud occurred only after the parties entered the contract.

Dep't 1994). As discussed above, although Rule 9(b) of the Federal Rules of Civil Procedure permits a plaintiff to aver scienter generally, the Court of Appeals has held:

> [T]he relaxation of Rule 9(b)'s specificity requirement for scienter must not be mistaken for license to base claims of fraud on speculation and conclusory allegations. In order to plead scienter, we require the complaint to allege facts that give rise to a strong inference of fraudulent intent. A strong inference of fraudulent intent may be established (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.

*Carter–Wallace*, 220 F.3d at 39. Travelers has tried to allege scienter through the "motive and opportunity" theory, but has failed to state facts showing that CDL had opportunity to commit fraud.

As already discussed above, CDL disclosed two drafts of the primary policy form to Travelers before Travelers and CDL agreed to the excess policy, and both drafts contained the broader business interruption coverage. (FAC ¶¶ 15, 30) Additionally, Travelers' new allegations concerning the calculation of the excess policy premiums are not sufficient to show scienter. When CDL reported to Travelers the business interruption values for one year, rather than three years, as the basis for calculating the excess policy premiums, CDL did not do so of its own volition, as if trying to deceive Travelers. (Pl. Opp.5) CDL reported these particular values only because "Travelers insisted that" it do so. (*Id.*)

Further, it must be recalled that Travelers' unilateral mistake claim can be considered only in a setting where the primary policy was available for review by Travelers, in which case CDL cannot be found to have had scienter because it had no opportunity to defraud Travelers as to the terms of the primary policy. *See John Hancock Mutual Life Ins. v. Carolina Power & Light Co.*, 717 F.2d 664, 671 (2d Cir.1983) (finding "no evidence of deception, fraud, or inequitable conduct" where agreement was available for review by plaintiff, holding that plaintiff "should have been aware of the provisions ... after a thorough reading of the contract"). In short, either Travelers had no opportunity to review the policy and thus Travelers' unilateral mistake claim is moot, *see World Trade Center*, 345 F.3d at 168, or Travelers did have an opportunity to review the policy and CDL had no opportunity to commit fraud, *see Carter–Wallace*, 220 F.3d at 39. Therefore, Travelers has failed to allege scienter.

### c. Reasonable Reliance

Travelers alleges that it issued "follow form" excess coverage "[b]ased upon the custom and practice in the insurance industry, as well as [Willis'] course of dealings," which led Travelers to believe that "the Travelers policy would be subject to amendments necessary accurately to reflect the parties' intentions and the terms of the December 11, 2000 and the December 29, 2000 binder." (*Id.* at ¶ 89) Travelers claims that "Willis was aware of this custom...." (*Id.* at ¶ 92) Travelers contends that its reliance on industry custom and its dealings with Willis, as CDL's agent, in issuing "follow form" coverage was reasonable. (*Id.* at ¶ 92)

"In assessing the reasonableness of a plaintiff's alleged reliance, [the court must] consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any

agreements between them." *Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 195 (2d Cir.2003). The Court of Appeals has held:

> [W]here a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or *inserting appropriate language in the agreement for his protection,* he may truly be said to have willingly assumed the business risk that the facts may not be as represented.

*Id.* (quoting *Rodas v. Manitaras,* 159 A.D.2d 341, 343, 552 N.Y.S.2d 618 (1st Dep't 1990)) (internal quotation marks omitted) (emphasis in original). "Succinctly put, a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament." *Emergent Capital,* 343 F.3d at 195.

■ Travelers has not alleged that CDL agreed to incorporate Travelers' proposed terms into the primary policy or even to relay Travelers' proposed terms to Lexington. Travelers alleges only that it asked CDL to relay its proposed terms to Lexington and to seek to incorporate these terms into the primary policy, but there is no allegation that CDL agreed to do either. Moreover, after reviewing two drafts of the policy with the broader coverage and knowing that the primary policy had not yet been issued, Travelers nevertheless proceeded with the transaction by issuing its excess policy in February explicitly "following form" and issuing an endorsement in June reiterating "follow form" coverage. Travelers did not attempt to include any language in its excess policy form to protect itself. Travelers had already negotiated this specific issue of coverage and drafted language in its proposed terms and its binder. Travelers could have simply included the same language from its proposed terms and binder in its excess policy form to protect itself and "followed form" as to undisputed or less significant terms of coverage.

Further, the setting in which Travelers' unilateral mistake claim has to be considered must be remembered yet again. Travelers cannot claim reasonable reliance where the actual terms of the primary policy were available for review by Travelers before the time of loss because Travelers would have had "the means of knowing, by the means of ordinary intelligence, the truth of the subject of the representation." *Wynn,* 273 F.3d at 156. If Travelers chose not to make use of those means for whatever reason, "it is [Travelers'] own evident lack of due care which is responsible for [Travelers'] predicament." *Emergent Capital,* 343 F.3d at 195. In short, and again, either Travelers had no opportunity to review the policy and thus Travelers' unilateral mistake claim is moot, *see World Trade Center,* 345 F.3d at 168, or Travelers did have an opportunity to review the policy and thus its reliance upon Willis or CDL was unreasonable, *see Emergent Capital,* 343 F.3d at 195. Therefore, Travelers has failed to allege reasonable reliance.

Accordingly, because Travelers has failed to allege the elements of fraud and reformation or rescission of an agreement for unilateral mistake is appropriate only where there is some showing of fraud, *see AMEX,* 316 F.3d at 161, and because neither reformation nor rescission is permitted where the parties entered an agreement based upon uncertain or contingent events and the claim is based upon mistake as to the outcome of such an event, *see Chimart,* 66 N.Y.2d at 574, 498 N.Y.S.2d 344, 489 N.E.2d 231, CDL's motion to dis-

miss Travelers' claim for unilateral mistake is granted.

### 3. Rescission Based upon Mistake

Travelers' seventh claim for relief is entitled "rescission based upon mistake." (FAC ¶ 96) It is unclear why Travelers has pleaded this as a separate, independent claim given that Travelers is seeking rescission based upon mistake under its two preceding causes of action for mutual mistake or, in the alternative, unilateral mistake. (*Id.* at ¶¶ 74, 81) Travelers' seventh claim does not allege any additional facts, and thus is entirely duplicative of the two preceding claims. Accordingly, CDL's motion to dismiss Travelers' claim for rescission based upon mistake is granted.

### C. Claim for Breach of Contract

Travelers alleges that its policy contains a clause entitled "Concealment, Misrepresentation or Fraud," which reads in relevant part:

> This policy is void in case of fraud by the insured as it relates to this policy at any time. It is also void if the insured, or any other insured, at any time, intentionally conceal [*sic*] or misrepresent [*sic*] a material fact concerning: (1) This policy; (2) The Covered Property; (3) The Insured's interest in the Covered Property; or (4) A claim under this policy.

(FAC ¶ 101) Travelers alleges the same factual basis for fraud in breach of this provision as underlies its unilateral mistake claim. Therefore, this claim fails for all the same reasons as Travelers' unilateral mistake claim. Accordingly, CDL's motion to dismiss Travelers' claim for breach of contract for violation of this policy provision is granted.

For the reasons set forth above, CDL's motion to dismiss is granted in part and denied in part, and plaintiff's motion to amend its First Amended Complaint is granted, with the terms upon which plaintiff may proceed to be decided later at a conference with the parties.

SO ORDERED.